UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CHARLES LANGONE, as FUND MANAGER )
of the NEW ENGLAND TEAMSTERS AND )
TRUCKING INDUSTRY PENSION FUND, )
)
)
Plaintiff, )
) C.A. No. 04cv10039 RCL
v. )
)
DUROD, LIMITED )
)
Defendant. )
)

**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF**
**HIS MOTION FOR SUMMARY JUDGMENT**

I.   INTRODUCTION

This is an action under the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §1001, *et seq.*, brought on behalf of the New England Teamsters and Trucking Industry Pension Fund ("Pension Fund" or "Fund") to compel a payroll audit of Defendant Durod, Limited, and to collect interest and underpayments on past due contributions owed to the Fund.

Defendant has failed to make pension contributions to the Fund since January 2004, owes past due interest and underpayments, and has refused to comply with Plaintiff's requests for a payroll audit, including refusing and failing to provide any documents in response to Plaintiff's request, in violation of Section 515 of ERISA, 29 U.S.C. §1145.

II.  FACTS

The Facts necessary to determine the issues in the instant case are set forth in the Plaintiff's Statement of Undisputed Facts, which is hereby incorporated by reference.

The Central Artery/Tunnel Project and Project Labor Agreement.

In 1997, the Central Artery (I-93)/Tunnel (I-90) Project Labor Agreement ("PLA") was entered into by and between Bechtel/Parsons Brinckerhoff on behalf of the Massachusetts Department of Public Works; the Building & Construction Trades Council of the Metropolitan District and its affiliated Local Unions; and the Building and Construction Trades Department, AFL-CIO and its Affiliated International Unions and their Affiliated Local Unions. (Plaintiff's Statement of Facts, ¶ 14; Exhibit 3).

Article X, Section 2 of the PLA provides that a participating contractor "agrees to pay contributions to the established employee benefit funds in the amounts designated," and also "adopts and agrees to be bound by the written terms of the legally-established Trust Agreements specifying the detailed basis on which payments are to be made into, and benefits paid out of, such Trust Funds." (Pl's St. Facts, ¶ 15; Exhibit 3).

On or about August 1, 1997, a "Trucking Issues Committee" was formed to address relevant issues regarding the application of the Massachusetts Minimum Wage Law and other wage and benefit issues for truckers and trucking companies who provide support for the Central Artery/Tunnel (CA/T) Project.  (Pl's St. Facts, ¶ 16).  As a result of the Committee's formation, the parties negotiated the "Central Artery/Tunnel Project Memorandum of Agreement on Trucking Issues" ("MOA"). (Pl's St. Facts, ¶ 17; Exhibit 4).

Section 8A of the MOA provides that "the Contractors agree that they, or their designated approved Subcontractor, will employ the truckers on the CA/T Project and shall

2

ensure payments on their behalf to the Construction Teamsters Health & Welfare Fund and the New England Teamsters & Trucking Industry Pension Fund as required by the Teamsters Agreement . . ." (Pl's St. Facts, ¶ 19; Exhibit 4).

Section 8B of the MOA also provides that "subcontractors who use truck drivers that they consider to be independent contractors shall make fringe benefit fund contributions based on all hours worked by such truck drivers," and that hours for such truck drivers are to be reported in the same manner in which hours for employee truck drivers are reported. (Pl's St. Facts, ¶ 20; Exhibit 4).

On or about September 24, 1997, the Massachusetts Highway Department, Bechtel Parsons Brinckerhoff, and Teamsters Local Union No. 379 entered into a "Memorandum of Understanding as to Teamster Benefits" ("MOU"), in accordance with the Central Artery/Tunnel (CA/T) Project Memorandum of Agreement on Trucking Issues. Paragraph 1 of the MOU provides that:

> All employee-drivers who the contractor directly employs and who perform work on the CA/T Project are covered by the CA/T Project Labor Agreement (PLA). Applicable contributions to the Construction Teamsters' Health and Welfare Fund and the New England Teamsters and Trucking Industry Pension Fund (Funds) must be made on their behalf by their employers and such employee-drivers will receive benefits from the Funds' Plans of Benefits. (Pl's St. Facts, ¶ 22; Exhibit 5).

Paragraph 2 of the MOU exempts employers from having to make contributions for owner-operators who are employers by virtue of employing one or more drivers totaling at least 160 hours in the aggregate for work on the CA/T Project during the 6 month period before certification, or employing one or more drivers totaling at least 600 hours in the aggregate for work at construction sites other than the CA/T Project during the 12 month period before certification. (Pl's St. Facts, ¶ 23; Exhibit 5). Paragraph 3 of the MOU then

3

provides, however, that "all owner-operators who provide support for CA/T Project Work who do not qualify under paragraph 2, above, shall be deemed, for the purposes of the State Prevailing Wage Law and the PLA, Project employees and contributions must be made on their behalf to the Funds." (Pl's St. Facts, ¶ 24; Exhibit 5).

The Pension Fund

The New England Teamsters and Trucking Industry Pension Fund is a defined benefit multi-employer pension plan governed by the Employee Retirement Income Security Act of 1974 ("ERISA"). (Pl's St. Facts, ¶ 1). The Fund was established for the purpose of receiving contributions and providing pension benefits to eligible employees pursuant to an Agreement and Declaration of Trust dated April 11, 1958 ("the Trust Agreement"), which has been amended from time to time. (Pl's St. Facts, ¶ 3; Exhibit 1).

The Fund is administered by an eight-member Board of Trustees in accordance with the terms of the Trust Agreement and the Rules and Regulations of the New England Teamsters and Trucking Industry Pension Plan ("Pension Plan" or "Plan"). (Pl's St. Facts, ¶ 4; Exhibit 1).

Contributions are paid to the Fund at an hourly rate determined by collective bargaining agreements, as defined by Article I, Section 1.08 of the 1997 Rules and Regulations of the Pension Plan, with amendments through April 30, 2003 ("2003 Plan" or "Plan"), between contributing employers and local teamster unions participating in the Fund. (Pl's St. Facts, ¶ 5; Exhibit 2). Contributions are paid on behalf of employees for each hour of employment "covered" by these collective bargaining agreements. (Pl's St. Facts, ¶ 5; Exhibit 2). Contributing employers to the Fund are defined by Article I, Section 1.09 of the Plan, and Participating Local Unions are defined as those unions that have been

accepted for participation by the Fund Trustees and have accepted the Trust Agreement in writing pursuant to Article I, Section 1.22 of the Plan. (Pl's St. Facts, ¶¶ 6-7; Exhibit 2).

The Trust Agreement contains a Standard Participation Agreement titled "Mandatory Contract Language for Pension Fund," which is attached to the Trust Agreement as "Appendix 'A'" and provides, in relevant part that the Employer agrees to make payments to the New England Teamsters and Trucking Industry Pension Fund "for each and every employee performing work within the scope of and/or covered by this collective bargaining agreement." (Pl's St. Facts, ¶ 8; Exhibit 1).

Article V, Section 5 of the Trust Agreement provides that each contributing employer is to report contributions to the Fund on remittance reports required by the Trustees (Pl's St. Facts, ¶ 10; Exhibit 1), and Paragraph (e) of Appendix A of the Trust Agreement entitles the Trustees to audit a contributing employer's payroll and wage records:

> All contributions shall be made at such time and in such manner as the Trustees shall reasonably require; and the Trustees shall have the authority to have an audit of the payroll and wage records of the Employer for all employees performing work within the scope of and/or covered by this collective bargaining agreement for the purpose of determining the accuracy of contributions to the Pension Fund and adherence to the requirements of this section of the collective bargaining agreement regarding coverage and contributions. (Pl's St. Facts, ¶ 11; Exhibit 1).

<u>Durod Assents to the Project Labor Agreement.</u>

On or about November 13, 1997, the Fund opened an account for Durod and sent Durod remittance reports on which it was to report monthly pension contributions for its employees. (Pl's St. Facts, ¶ 26; Exhibit 7).

5

The Fund also on that date sent Durod and Teamsters Local 379 a letter that stated as follows:

> In accordance with information recently received, we have opened the above account and started billing. According to our records contributions have been received through September 1997.
> This should not be interpreted as acceptance by the Board of Trustees of your participation in this Pension Plan.
> Providing the account is paid up to date with no delinquencies, acceptance of a new employer is generally a formality and principally involves the Board's determination of minimum period of contribution payments required before employees may retire, based on the recommendation of the Fund's actuaries. Until the Employer's participation is accepted by the Board, contributions received will be held in escrow, and the Employees reported on this account will not receive Pension Credit for these escrow payments.
> Enclosed please find a Questionnaire requesting information pertinent to your participation in this Fund. Please complete this Questionnaire and return to this office as soon as possible. (Pl's St. Facts, ¶ 25; Exhibit 6).

In a letter dated November 19, 1997 and addressed to the Fund, Paul Walsh, Secretary-Treasurer and Principal Executive Officer of Teamsters Local 379, wrote: "Please open an account for Durod Ltd. They will be working under the Central Artery Tunnel Project Agreement and will not be signing any pension documents." (Pl's St. Facts, ¶ 27; Exhibit 8).

On November 20, 1997, Durod completed the questionnaire supplied by the Fund. In response to the question, "Is your current Collective Bargaining Agreement with the above Employer your first Agreement covering this bargaining unit?", James Roderick, Jr., President of Durod, checked "Yes". (Pl's St. Facts, ¶ 28; Exhibit 9).

On or about March 26, 2002, Roderick, on behalf of Durod, entered into "Exhibit A Certification," in which he reaffirmed Durod's assent to the Project Labor Agreement. Paragraph 9 of the Certification states:

> I hereby agree to comply with and be bound to the Project Labor Agreement, Division 1, Special Provisions covering work to be performed on the Central

Artery/Tunnel Project. The terms and conditions of the Project Labor Agreement have been entered into by the signatory unions and Bechtel/Parsons Brinckerhoff and shall apply with respect to the work covered by all contracts on said Project. (Pl's St. Facts, ¶ 29; Exhibit 10).

<u>Durod Makes Contributions to the Fund.</u>

Following Durod's acceptance of the PLA in November 1997, it began making monthly contributions to the Fund for its employees and submitting monthly remittance reports. Durod made contributions to the Funds for each month between December 1997 and January 2004, when it abruptly stopped making contributions. (Pl's St. Facts, ¶ 30). In the six months prior to January 2004, Durod's average monthly pension payment to the Fund was $2,658.53. (Pl's St. Facts, ¶ 31).

Between September 1997 and January 2004, Durod was late in making contributions to the Fund for the months of June, July, and August 1999; April 2000; October 2001; September, October, November, and December 2002; January 2003; March 2003; July, August, September, and October 2003; December 2003; and January 2004. (Pl's St. Facts, ¶¶ 32-38). As a result, the Fund assessed a total of $457.63 in interest against Durod. (Pl's St. Facts, ¶ 39). In addition, Durod underpaid on the amount of contributions due for May 2000, December 2000, and January 2004, for a total underpayment of $264.29. (Pl's St. Facts, ¶ 40). To date, neither the interest nor the underpayments have been paid to the Fund. (Pl's St. Facts, ¶ 41). Paragraph (e) of Appendix A of the Trust Agreement provides that if an employer shall

> fail to make contributions by the 20th day of the month following the month during which the employees performed work or received pay or were due pay within the scope of this Agreement . . . the Employer shall be liable to the Trustees for all costs of collecting the payments due together with attorneys' fees and such interest, liquidated damages or penalties which the Trustees may assess or establish at their discretion. (Pl's St. Facts, ¶ 12; Exhibit 1).

7

The Audit Attempt

On or about May 14, 2003, Fund Manager Charles Langone notified Durod that it had been selected for an examination of payroll and wage records for the period of January 1, 1997 through December 31, 2002, and requested that Durod make available weekly payroll registers; IRS Forms W-2, 941, and 1099; and OSHA logs where applicable. (Pl's St. Facts, ¶ 42; Exhibit 12). Durod refused to comply with Langone's request. (Pl's St. Facts, ¶ 44).[1]

On or about December 10, 2003, Fund Counsel sent a letter to James R. Roderick, Jr., President of Defendant Durod, demanding that Durod reverse its earlier position and allow the Fund's auditor to conduct a payroll audit pursuant to the PLA and the Fund's Agreement and Declaration of Trust. (Pl's St. Facts, ¶ 43; Exhibit 13). Once again, Durod refused to comply. (Pl's St. Facts, ¶ 44).

III.  Argument

A.  Summary Judgment Standard

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Rule 56(c) of the Federal Rules of Civil Procedure provides for the entry of summary judgment where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." The party moving for summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact. *Perez De*

---

[1] At the Scheduling Conference held on November 10, 2004, Defendant was directed to provide records pertaining to the Central Artery Tunnel Project.

*La Cruz v. Crowley Towing and Transportation Co.*, 807 F.2d 1084, 1086 (1st Cir. 1986), *cert. denied*, 487 U.S. 1050 (1987).

Material facts are those that have the potential to affect the outcome of the suit under applicable law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Nereida-Gonzalez v. Tirado-Delgado*, 990 F.2d 701, 703 (1st Cir. 1993). The existence of a factual dispute will not necessarily defeat a summary judgment motion. "[T]he requirement is that there must be a *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). No genuine issue for trial exists where the record taken as a whole could not lead a rational trier of facts to find for the nonmoving party. *Matsushita Electric Industry Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986).

B.   <u>Durod is Bound to the Project Labor Agreement and is Required to Make Pension Contributions to the Fund.</u>

In or about December 1997, Durod began making contributions on the Central Artery/Tunnel Project. Durod opened an account with the Fund to make contributions for their employees working on the Project, and agreed to be bound by the terms of the Project Labor Agreement.

Durod's assent to the PLA is evidenced by the November 13, 1997 letter from the Fund to Durod in which the Fund stated that it had opened an account and started billing:

> In accordance with information recently received, ***we have opened the above account and started billing. According to our records contributions have been received through September 1997.***
> This should not be interpreted as acceptance by the Board of Trustees of your participation in this Pension Plan.
> Providing the account is paid up to date with no delinquencies, ***acceptance of a new employer is generally a formality*** and principally involves the Board's determination of minimum period of contribution payments required before employees may retire, based on the recommendation of the Fund's actuaries . . . (Exhibit 6) (Emphasis added).

9

The November 13, 1997 letter also requested that Durod complete a questionnaire prior to the Fund's accepting it as a contributing Employer.

In addition, Paul Walsh, Secretary-Treasurer and Principal Executive Officer of Teamsters Local 379, in a letter sent to the Fund dated November 19, 1997, wrote: "Please open an account for Durod Ltd. They will be working under the Central Artery Tunnel Project Agreement and will not be signing any pension documents." (Exhibit 8). Durod then completed the aforementioned questionnaire dated November 20, 1997, and checked the box marked "yes" indicating that its "current Collective Bargaining Agreement" was its first for the unit represented by Teamsters Local 379. (Exhibit 9). Clearly, the collective bargaining agreement that Durod referred to in the questionnaire was the Project Labor Agreement.

Thus, by working on the Central Artery/Tunnel Project, completing the Fund's questionnaire, and opening an account with the Fund, Durod agreed to be bound by the terms of the PLA. Consequently, Durod, by virtue of its being bound to the PLA, is also bound to subsequent agreements entered into by the parties to the PLA concerning the Central Artery/Tunnel Project, including the "Memorandum of Agreement" (MOA), and the "Memorandum of Understanding" (MOU).

The MOA provides, in Section 8A, that the contractors or their designated approved subcontractors "will employ the truckers on the CA/T Project and *shall ensure payments on their behalf to . . . the New England Teamsters & Trucking Industry Pension Fund as required by the Teamsters Agreement.*" (Exhibit 4).

In addition, by assenting to the PLA and opening an account with the Fund, Durod agreed to be bound by the terms of the Fund's Trust Agreement. Article X, Section 2 of the

Project Labor Agreement states that a participating contractor shall "*agree to pay contributions to the established employee benefit funds*," and further provides that a participating contractor "*adopts and agrees to be bound by the written terms of the legally-established Trust Agreements* specifying the detailed basis on which payments are to be made into, and benefits paid out of, such Trust Funds." (Exhibit 3).

The Trust Agreement contains a Standard Participation Agreement titled "Mandatory Contract Language for Pension Fund," which is attached to the Trust Agreement as "Appendix 'A'" and states, in relevant part, that "*the Employer agrees to make payments to the New England Teamsters and Trucking Industry Pension Fund for each and every employee performing work within the scope of and/or covered by this collective bargaining agreement.*" (Exhibit 1).

Thus, by virtue of its assenting to the terms of the PLA, Durod became bound to the terms of the Trust Agreement. These documents, taken together, require Durod to make contributions to the Fund for hours worked on the Central Artery/Tunnel Project.

In addition, the MOA provides that not only must participating contractors make contributions to the Fund on behalf of their own employee-drivers, but contributions must also be made for all "owner-operators" used by contractors who provide support for the CA/T Project other than those owner-operators who employ one or more drivers totaling at least 160 hours for work on the Project during the six-month period before certification, or who employ one or more drivers totaling at least 600 hours for work at construction sites other than the CA/T Project during the twelve-month period before certification. (Exhibit 4).

Finally, Durod re-confirmed its assent to the PLA on March 26, 2002, when James Roderick entered into an "Exhibit A Certification" on behalf of Durod. Article 9 of that

document includes Durod's agreement to "*comply with and be bound to the Project Labor Agreement, Division 1, Special Provisions covering work to be performed on the Central Artery/Tunnel Project.*" Durod also agreed that "the terms and conditions of the Project Labor Agreement . . . shall apply with respect to the work covered by all contracts on said Projects." (Exhibit 10).

Thus, beginning in 1997, and reaffirmed in 2002, Durod agreed to be bound by the terms of the PLA, MOA, and MOU, and, by extension, to the terms of the Fund's Trust Agreement. By assenting to the terms of these agreements, Durod agreed to make timely monthly contributions to the Fund.

C.   Durod's Assent to the PLA is Further Evidenced by its Having Made Contributions to the Fund from September 1997 through January 2004.

Following Durod's acceptance of the PLA in November 1997, it began making monthly contributions to the Fund for its employees and submitting monthly remittance reports. Durod made monthly contributions to the Funds from September 1997 through January 2004 for work performed on the Central Artery/Tunnel Project.

Thus, if Durod were to somehow claim that it is not bound to the PLA, its consistent payment of contributions to the Funds on the Central Artery/Tunnel Project for over six years belies any such defense. Rather, it serves as additional evidence that Durod agreed to make contributions to the Fund and to be bound by the PLA and the Fund's Trust Agreement.

"When the operation of an ordinary contract is not clear from its language, a court generally may consider extrinsic evidence to determine the intent of the parties." *Northwest Administrators, Inc. v. Sacramento Stucco,* 86 F.Supp. 2d 974, 980 (N.D.Ca. 2000); *Casey v. Lifespan Corporation,* 62 F.Supp. 2d 471, 480 (D.R.I. 1999) ("If, on its face, the contract

appears ambiguous, the court must then consider extrinsic or parole evidence to determine the intent of the parties."). In addition, "this principle is applied more liberally in the case of a collective bargaining agreement." *Sacramento Stucco* at 980. Thus, in reviewing extrinsic evidence to help illuminate ambiguous contract language, a trier of fact may "'consider the parties' conduct subsequent to contract formation . . . and such conduct is to be given great weight.'" *Id.*, quoting *Arizona Laborers, Teamsters and Cement Masons Local 395 Health and Welfare Trust Fund v. Conquer Cartage Co.*, 753 F.2d 1512, 1517 (9th Cir. 1985).

Here, Durod made contributions to the Funds between December 1997 and January 2004, not once failing to make some amount of contributions (although not always in full and/or in a timely fashion) for its employees and owner-operators who performed work on the Central Artery/Tunnel Project. This conduct further evidences its assent to the PLA and its obligation to make contributions to the Fund. The Fund is therefore entitled to all contributions owed by Durod for work performed from February 2004 to the present on the Central Artery/Tunnel Project.

D. The Fund is Entitled to Payment of Interest and Underpayments.

Paragraph (e) of Appendix A of the Trust Agreement provides that if an employer fails to make contributions by the 20th day of the month following the month during which the employees performed work, the Employer shall be liable to the Trustees for all costs of collecting the payments, plus attorneys' fees, interest, and liquidated damages or penalties which the Trustees may assess or establish at their discretion. (Exhibit 1).

Pursuant to this provision, the Fund assessed interest for each monthly contribution payment that Durod made to the Fund after the 20th day of the month following the month for which the contributions were due. There is no dispute that Durod was late in making

payments for the months of June, July, and August 1999; April 2000; October 2001; September, October, November, and December 2002; January 2003; March 2003; July, August, September, and October 2003; December 2003; and January 2004. As a result, Durod incurred a total of $457.63 in interest.

In addition, Durod underpaid on the amount of contributions due for May 2000, December 2000, and January 2004, for a total underpayment of $264.29.

Nonetheless, despite numerous demands to collect the interest and underpayment amounts, Durod has failed to make payment.

E.   <u>The Fund is Entitled to Audit Durod's Payroll and Wage Records</u>.

On May 10, 2003, Fund Manager Charles Langone notified Durod that it had been "selected for an examination of payroll and wage records for the period 1/01/1997 through 12/31/2002." Based upon the PLA, MOU, MOA, and the Trust Agreement, the Fund is clearly entitled to a payroll audit of Durod concerning its work on the Central Artery/Tunnel Project, not only for the dates listed above, but through May 2005.

As noted, *infra*, Durod assented to the terms of the PLA in 1997, and reaffirmed that assent in 2002. The PLA binds Durod to the terms of the Fund's Trust Agreement. Paragraph (e) of the Standard Participation Agreement ("Appendix 'A'" of the Trust Agreement) provides that *"**the Trustees shall have the authority to have an audit of the payroll and wage records of the Employer** for all employees performing work within the scope of and/or covered by this collective bargaining agreement."* (Exhibit 1).

Thus, there can be no dispute that the Fund is entitled to audit the wage and payroll records of Durod with respect to the Central Artery/Tunnel project.

Nonetheless, despite receiving a May 14, 2003 audit notification letter from Fund Manager Charles Langone, as well as a letter from Fund Counsel dated December 10, 2003 reiterating Mr. Langone's request to audit the company, Durod has steadfastly refused to comply with the audit demand in any form whatsoever, including refusing to make any of the requested records available to the Fund. Durod has never articulated any valid defense for its failure to allow the Fund to conduct such an audit, however.

As the PLA and Trust Agreement clearly authorize the Fund to audit an employer's payroll and wage records, Durod is clearly in breach of its obligations under the PLA.

## IV.  CONCLUSION

For all of the foregoing reasons, and on the record as a whole, the Court should grant Plaintiff's Motion for Summary Judgment in its entirety, and order Defendant to:

1) Submit to a payroll audit concerning all records pertaining to the Central Artery/Tunnel Project from 1997 to the present, including providing: a) Weekly payroll registers from 1997 to the present; b) IRS Forms W-2, 941, and 1099 from 1997 to the present; (c) OSHA logs from 1997 to the present; and (d) Records of payments made to all of Durod's trucking subcontractors performing work on the Central Artery/Tunnel Project from 1997 to the present.

2) Make payment of delinquent contributions owed for February 2004 to the present, plus interest as determined by the Funds Trust Agreement;

3) Make payment of late charges for interest and underpayment owed on the delinquent contributions in the amount of $736.11;

4) Pay Plaintiff's Attorney Fees and Costs; and

5) Order such further relief as the Court deems appropriate.

Dated: June __10__, 2005

Respectfully submitted,

For the Plaintiff,
CHARLES LANGONE, as
FUND MANAGER of the
NEW ENGLAND TEAMSTERS &
TRUCKING INDUSTRY PENSION FUND,

By his Attorneys,

Catherine M. Campbell, BBO #549397
Jonathan M. Conti, BBO #657163
Feinberg, Campbell & Zack, P.C.
177 Milk Street, Boston, MA 02109
(617) 338-1976

## CERTIFICATE OF SERVICE

I, Jonathan M. Conti, attorney for the Plaintiff, hereby certify that on this day I mailed a copy of the within document by first class mail, postage prepaid, to Robert W. Galvin, Esq., Galvin & Galvin, SP, 10 Enterprise Street, Suite 3, Duxbury, MA 02332-3315.

Dated: June 10, 2005

Jonathan M. Conti

16